## WOLFE v. PRAIRIE OIL & GAS CO. et al.
### No. 1343.

Circuit Court of Appeals, Tenth Circuit.

April 8, 1936.

Flynn, Green & Anderson, of Oklahoma City, Okl., on the brief), for appellant.

J. H. Miley, of Oklahoma City, Okl. (Paul B. Mason, Edward H. Chandler, T. J. Flannelly, and Summers Hardy, all of Tulsa, Okl., and Miley, Hoffman, Williams, France & Johnson, of Oklahoma City, Okl., on the brief), for appellees.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

On August 23, 1932, Wolfe commenced this action against The Commonwealth Oil and Gas Company, formerly The Prairie Oil and Gas Company, and hereinafter called the Prairie, and Sinclair Prairie Oil Company, hereinafter called the Sinclair, to recover the value of certain royalty oil together with interest thereon, which oil was produced from a tract of land in Seminole County, Oklahoma, by the Amerada Petroleum Corporation, hereinafter called Amerada, under an oil and gas lease running from Wolfe to one Smith and assigned by the latter to Amerada.

The action was originally commenced in the District Court of Oklahoma County and was duly removed to the District Court of the United States for the Western District of Oklahoma.

The same lease was involved in Wolfe v. Texas Company (C.C.A.10) 83 F.(2d) 425 (decided April 8, 1936) and reference is made to our opinion in that case for the facts respecting the lease, the litigation concerning the title thereto, the transactions beween Wolfe and the Amerada and an existing general trade usage.

On May 27, 1926, the Bass Furniture and Carpet Company executed and delivered an instrument ratifying the lease.

On December 21, 1926, the Amerada requested the Prairie to arrange for pipe line connections with wells on the lease and to purchase and run a portion of the oil being produced. The Prairie agreed and arranged for the pipe line connections.

On February 9, 1927, the Amerada executed and delivered to the Prairie the following written request and offer:

"February 9, 1927.

"Gentlemen: We own four producing oil wells * * * in Seminole County, State of Oklahoma * * *.

"We ask you to secure the extension of the gathering lines of a Pipe Line Compa-

R. M. Rainey and Streeter B. Flynn, both of Oklahoma City, Okl. (Rainey,

ny to said property, and in consideration thereof, we offer to sell you the production therefrom for the term of ——— from date of such extension, under the usual and prevailing terms and conditions as provided in your regular form of division order which we will execute or cause to be executed and delivered to you. Abstracts of title will be furnished you for examination and approval, and proceeds of oil runs may be held by you, without liability for interest, pending approval of title or the determination of adverse claims or demands thereto.

"Please arrange for pipe line connection.

"Amerada Petroleum Corporation."

The regular form of division order referred to therein in part reads as follows:

"The Prairie Oil and Gas Company is hereby authorized, until further notice, to receive such oil for purchase from said parties, subject to the following conditions:

"First—The oil run in pursuance of this division order shall become and be the property of The Prairie Oil and Gas Company upon actual delivery thereof into the lines of any common carrier pipe line designated by it.

"Second—The oil purchased and received in pursuance of this division order shall be delivered F.O.B. to any pipe line designated by The Prairie Oil and Gas Company, which may be able and willing to gather and receive the same, and shall be paid for to the well owners or their assigns in proportion to their respective interests shown above, at the market price paid by The Prairie Oil and Gas Company for the same kind and quality of oil on the same day that said oil, purchased in pursuance of this division order, is delivered as aforesaid. Settlement therefor shall be made monthly at Independence, Kansas, by mailing or delivery to the persons from whom such oil is so purchased, their heirs, assigns or legal representatives, on or before the 12th day of each month, a bank check or draft for the amount due on account of oil so purchased during the preceding month. * * *

"Fourth—In case of adverse claim of title to the land from which such oil is produced, or adverse claim of title to the oil sold and purchased under this division order or the proceeds thereof, The Prairie Oil and Gas Company shall be protected against all reasonable cost and expense necessarily incurred in defending against such claim, whether in its own defense or in defense of the carrier transporting the oil for its account, and may retain the purchase price of such oil without liability for interest, until such adverse claim is settled and determined, or until it has been furnished satisfactory indemnity."

The Prairie caused the Prairie Pipe Line Company to extend its gathering line to the working and receiving tanks of the Amerada on the lease. During the months of December, 1926, and January, April, May and June, 1927, oil so purchased by the Prairie, was run from the lease through pipe lines of the Prairie Pipe Line Company to consignees, designated by the Prairie, aggregating 61,292.74 barrels. The gross purchase price thereof amounted to $101,846.32. The purchase price of the 1/8th royalty interest was $12,730.79. The Prairie paid a gross production tax on the royalty oil amounting to $381.92, leaving a net royalty of $12,348.87. Wolfe's share, viz., 7/12th of 1/8th thereof, amounted to $7203.51.

On October 17, 1931, Wolfe wrote a letter to the Prairie in which he inquired as to the agreement between the Prairie and Amerada for the purchase of the oil, stated at least half of the title had been freed of adverse claims, and requested, if payments were to be made to Amerada for distribution to the royalty owners, that they be made at once in order that he might receive his share without further delay.

On October 19, 1931, the Prairie wrote a letter to Wolfe in which it stated payment for the entire royalty interest had been withheld because of the litigation concerning the title, that on June 8, 1931, it had written Amerada requesting it to furnish a supplemental abstract upon the conclusion of the litigation and that such abstract had not been furnished, and suggested that Wolfe take the matter up with Amerada.

On October 26, 1931, Wolfe forwarded the Prairie a certified copy of the mandate of the State Supreme Court in the Bass Furniture Case (Wolfe v. Bass Furniture & Carpet Co.), 152 Okl. 125, 3 P.(2d) 895, the judgment entered thereon in the District Court of Seminole County awarding him an undivided 2/3rds of 11/12th of the land, and a copy of a portion of the Supreme Court's opinion together with a letter in which he stated 2/3rd of 11/12ths of the title had been free from adverse

claims since the previous December, that he presumed the Prairie had been furnished an abstract by Amerada and requested payment without further delay. Wolfe's statement as to adverse claims was not accurate. The Fixico suit was still pending when this letter was written. See Wolfe v. Texas Company, supra.

On November 4, 1931, the Prairie wrote Wolfe that payment for his interest, to-wit: 7/12th of 1/8th of the royalty oil would be made on execution of an enclosed division order and requested him to execute and return the order. The division order contained the provisions above quoted from the Prairie's regular form of division order. It will be noted its provisions respecting interest refer only to adverse claims respecting the title and provide interest shall not accrue on the unpaid purchase price until any adverse claims shall be settled and determined. By signing such order Wolfe would not have waived interest after the date Prairie approved the title. On November 5, 1931, Wolfe wrote the Prairie he could not execute the division order and requested the Prairie to forward him a check for the amount due him with a statement attached showing what the check covered. On November 6, 1931, the Prairie wrote Wolfe it did not remit for oil purchased until its regular division order had been executed and delivered and that it would hold the payment in suspense until Wolfe returned the executed division order.

On January 4, 1932, the Prairie tendered to the Amerada $7,203.51 in payment for Wolfe's share of the royalty oil sold by the Amerada to the Prairie. The tender did not include interest from the date the Prairie had approved the title.

In this action, Wolfe sought to recover the value of his share of the royalty oil sold by the Amerada to the Prairie, together with interest thereon from the end of each month during the period the oil was run. The action is based upon an alleged implied contract. It is predicated upon the theory that the Prairie converted the oil and that Wolfe had elected to waive the tort and sue upon implied contract. This is indicated by the allegations of Wolfe's petition and is affirmed by his counsel in their brief.

Wolfe made no provision to store his share of the royalty oil or any arrangements to market it as produced, but depended on the Amerada to market the oil.

From a judgment for the Prairie and Sinclair, Wolfe has appealed.

■ In the absence of an express provision in an oil and gas lease with respect to marketing the production, there is an implied duty on the part of the lessee to make diligent efforts to market the production in order that the lessor may realize on his royalty interest.[1]

■ Therefore, when Wolfe failed either to provide storage or to arrange for the marketing of his share of the royalty oil, not only was the Amerada impliedly authorized to sell it as his agent, but it became its duty so to do. Indeed there was no other practical way for the Amerada to take care of the royalty oil so as to avoid waste and loss; and there was no other way for it to comply with its lease covenant to deliver the royalty oil in the pipe line to the credit of the royalty owners. Wolfe v. Texas Co., supra.

The Amerada was authorized to sell the royalty oil to a responsible purchaser, at the posted price, on the usual terms and conditions. That it did, but instead of incorporating into the contract of sale by implication, the general trade usage, it did so by express provisions in the contract of sale, except it provided interest should commence upon "approval of title or the determination of adverse claims or demands thereto," instead of after approval of the title and the execution of a division order.

Wolfe claimed interest on the value of the oil from the end of each month during the period the oil was run; the Prairie asserted it was not required to pay either principal or interest until the division order was executed and delivered; while the contract provided for interest from the date the Prairie approved the title or the adverse claims were determined.

■■ We are of the opinion that the Amerada was authorized to enter into the contract of sale of Wolfe's share of the royalty oil as his agent and that Wolfe is bound by that contract. It follows that the Prairie was not guilty of conversion and

---

[1] Wolfe v. Texas Company, supra; Covenants Implied in Oil and Gas Leases, Merrill, pp. 150, 151, 152; Summers on Oil and Gas, § 131, p. 420; Cole Petroleum Company v. United States Gas & Oil Co., 121 Tex. 59, 41 S.W.(2d) 414, 417, 86 A.L.R. 719; Strange v. Hicks, 78 Okl. 1, 188 P. 347, 350.

438

an implied contract cannot be predicated on a waiver of tort.

The law will not imply a contract where there is an existing valid express contract embracing the same subject.[2]

Where an express contract, not under seal has been fully performed on plaintiff's part, and nothing remains to be done under it other than the payment of money by the defendant, plaintiff may declare on the contract or generally in indebitatus assumpsit and in either case the contract will limit the amount of his recovery;[3] but where the contract has not been fully performed by plaintiff, indebitatus assumpsit will not lie.[4]

The contract had not been fully performed on Wolfe's part in that he had not executed and delivered a division order. Hence indebitatus assumpsit would not lie for the money due under the contract.

We conclude Wolfe was not entitled to any relief in an action on implied contract.

The judgment is reversed and the cause remanded. Should Wolfe file a motion to amend his petition to conform to the proof, the trial court will pass on such motion and then proceed further in accordance with this opinion. Should Wolfe not file such a motion the court will dismiss his petition without prejudice to his right to bring an action on the express contract.

The costs of this appeal will be assessed against Wolfe.

---

[2] Allen v. Ford, 19 Pick. (Mass.) 217, 218; Brown v. Fales, 139 Mass. 21, 29 N.E. 211, 213; Whiting v. Sullivan, 7 Mass. 107, 109; Osterling v. Cape May Hotel Co., 82 N.J.Law, 650, 83 A. 887, 888; Hazen v. Cobb-Vaughan Motor Co., 96 Fla. 151, 117 So. 853, 858.

[3] United States Potash Co. v. McNutt (C.C.A. 10) 70 F.(2d) 126, 129; Dermott v. Jones, 2 Wall. 1, 9, 17 L.Ed. 762; Sharp v. McCargar, 114 Or. 435, 236 P. 262, 264.

[4] United States Potash Co. v. McNutt, supra; Dermott v. Jones, supra; American Locomotive Co. v. Harris (C.C.A. 1) 239 F. 234, 238; Hazen v. Cobb-

R. M. Rainey and Streeter B. Flynn, both of Oklahoma City, Okl. (Rainey, Flynn, Green & Anderson, of Oklahoma City, Okl., on the brief), for appellant.

Vaughan Motor Co., 96 Fla. 151, 117 So. 853, 858; Smith v. Sharpe, 162 Ala. 433, 50 So. 381, 382, 136 Am.St.Rep. 52. In Dermott v. Jones, supra, the court said: "While a special contract remains executory the plaintiff must sue upon it. When it has been fully executed according to its terms, and nothing remains to be done but the payment of the price, he may sue on the contract, or in indebitatus assumpsit, and rely upon the common counts. In either case the contract will determine the rights of the parties."